JORDAN AUTOMATIC SIGNAL CO. v. BROOKLYN HEIGHTS R. CO. et al.

(Circuit Court, E. D. New York. March 25, 1909.)

PATENTS (§ 328\*)—VALIDITY AND INFRINGEMENT—ELECTRIC RAILWAY SIGNAL SYSTEM.

The Jordan patent No. 497,408, for an electrical signaling system for railways, has for its special object the setting of a light or other signal at electric street railroad crossings to give notice of the proximity of a

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

car. It covers a combination of devices by which an auxiliary wire extending a distance either way from a crossing is placed parallel with and near to the trolley wire or main circuit, but normally insulated therefrom. The trolley wheel or other contact device on the car, however, connects the two wires and keeps them in connection until it passes beyond the auxiliary wire, and a current is sent through the same to and through a signal circuit, where it lights a lamp or sets some other danger signal and passes to the earth or other return circuit. *Held*, that such patent was not anticipated, and discloses invention if limited so as to include as an element the signal circuit, but as so construed it is not infringed by a train-signaling device by which a signal is normally held at safety by a current through an auxiliary wire which is shunted by an approaching train.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

In Equity. On final hearing.

D. Frank Lloyd (William S. Jackson and E. Hayward Fairbanks, of counsel), for complainant.

George D. Yeomans (Thomas Ewing, Jr., of counsel), for defendants.

CHATFIELD, District Judge. The patent in question is one of the many growing out of the rapid development and extension of the methods of propelling street cars by electricity, soon after the successful commercial use of the transmission of a constant current to the dynamo of the car by means of a conductor in electrical and moving contact with the feed wire, in the form known as a "trolley." The patentee, one William H. Jordan, seems to have had in mind the particular advantage and utility of giving a signal at a street crossing, or at other point of danger, upon the approach of a car, by means of the transmission of a portion of the current from the feed wire to the signal, when the car in question should reach a certain point, and to continue the operation of the signal or light until the car had passed along the track to a desirable distance upon the other side of the crossing. The transmission of a signal by an electric current, set in operation by a mechanical device, or by contact with an electrical conductor, was known in the art, and had been the subject-matter of various patents which will be referred to later. But Jordan used the idea of maintaining (by means of a second wire, in close proximity, but insulated, when not in use, from the feed wire of the trolley system) a signal current, active while the car should be passing over the space in which the presence of a car was to be signaled. Jordan did this by causing a portion of the current from the feed wire to be supplied by a sliding or rolling contact to this auxiliary wire, and, after passing through the signal, to return through the earth or other return conductor. He depicts in the drawings of his patent the placing of the auxiliary wire, with reference to the feed wire, in such manner that the concave rim of the trolley wheel would force the flexible auxiliary wire directly against the main feed wire, as the trolley wheel rolled along the feed wire, under the motion of the car.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

The patent to Jordan was issued under number 497,408, dated May 16, 1893, and contains the following specifications, among others:

"The present invention relates to means for displaying signals, particularly at road crossings, which signals are illuminated, or otherwise operated, by being connected to a trolley or supply wire extending along a track or way on which vehicles are adapted to travel," etc.

He states that the objects of the invention are to reduce expense and to simplify the circuit connections and apparatus.

The claims of the patent are 11 in number, but it is agreed by the witnesses and attorneys for each party to this suit that the first claim sufficiently sets forth the principle involved and the application of the patent, and that the result with reference to this claim would determine that with reference to the others as to which infringement is charged.

Claim 1 is as follows:

"(1) In an electrical signaling system for railways, the combination of a main circuit, an auxiliary circuit, a signal circuit connected between said auxiliary circuit and the earth or other return of the main circuit, and means carried by a car for maintaining electrical connection between the said main and auxiliary circuits, substantially as set forth."

In the course of his specifications Jordan states that:

"The signal lamps will ordinarily be out of circuit and unlighted. As a car comes along" the contact will be made, the lamps lighted, and the illumination continued, "until the car passes from the signal trolley wire at the opposite end," when the lamps will remain out of circuit, and connection be had only with the trolley or feed wire until a place is approached where it is necessary to give another signal.

Jordan further states that different means for supporting the signal trolley wire may be used, and that the wires need not be placed over the car.

With reference to this patent, as in the case of many others, the growth of the use of electricity as a motive power for street cars, and the adoption of what is known as the "third rail" or "shoe" system of contact alongside the car, and the underground conduit, in which there is also a third rail or wire, with a shoe or trolley connection, has made no difference in the scope of the patent. Similarly, the terms of the patents, speaking of devices with relation to trolley cars, have come to be frequently used indiscriminately with reference to any one of these three systems.

The defendant corporation maintains, among other electric car lines, a system of trains propelled by electric motors, upon an elevated track, in the city of Brooklyn, in this district, and at the particular points in question supplies current to the motors of the cars of these trains by means of a third rail placed alongside the track rails upon the elevated structure, and with a shoe or sliding contact continuously in position of contact with this third rail.

The particular signals examined by the witnesses in the case, and treated as typical of the subject-matter of the action, are located alongside of both the up and down tracks, near what is known as the "Boerum Place Station," where a sharp curve, together with a change in grade, makes it desirable to give notice to the oncoming train in either

direction of the presence of a preceding train within the limits of dangerous proximity. The engineers of the defendant railroad, however, were not content with the setting of a signal by either train, which should stand at danger or be lighted only upon the approach of another train. It was thought that the better method was to maintain a signal by a continuous current, which signal would be immediately released and set at danger, either by the presence of another train, or by any interruption in the passage of the current through the signal. This method of proving the integrity of the system seems to have been an outgrowth of the many devices by which an electrical current is maintained as a test, and the interruption of that current taken as a sign of danger or injury to the apparatus involved, and has long been known through the operation of telephone and telegraph lines, as well as in connection with electric railroads.

The defendant corporation, through its engineers, however, added to the idea of a test current of this nature the continuing contact current described by Jordan in his patent. They supplied an increased current to the auxiliary or signal wire by so locating the signal wire as to bring the shoe of the trolley car into an electrical connection with the signal wire at a point immediately in front of the signal connection through which the weak auxiliary current had previously been passing. This shoe acted as a shunting device and supplied an easier path to the current which passed through the auxiliary circuit or signal wire, until the shoe should leave or become out of contact with that signal wire at its further terminus. So long as this contact was maintained, the weak current, which had previously been sufficient to maintain the signal in place, would be absent, the signal would cease to be operated, and (in the form used by the defendant company) the magnet holding an arm with a colored disk would release that arm, whereupon the signal, from its own weight, would fall into a position plainly designating danger. The presence of artificial resistance at some point in the auxiliary circuit adds to the efficiency of the operation of this auxiliary current, and the device has proven a useful, convenient, and economical plan of protecting the track at the point in question from the presence of two trains in dangerous proximity.

As has been said, there is and can be no difference in principle between the application of the patent or of the defendant's method to a third rail rather than to a trolley wire, and aside from the fact that the patent calls for an open circuit, before contact is formed by the car, while the system of the defendant makes use of a closed circuit at all times, the greatest difference lies in the location of the signal. In the Jordan patent the signal is to be located at a point in the auxiliary circuit between the point of contact and the return conductor. In the defendants' system the signal is placed between the main conductor and the point of contact. The reason for this is apparent from the preceding explanation of the use made of the various currents. But the two questions, of location of the signal, and method of operating the signal, are necessarily involved with each other in considering whether the defendants' mode of construction is an infringement of the patent in question.

The following diagrams simply and plainly show the arrangement and operation of these two systems, and the claim of infringement

is based upon the fact that the defendant has made use of an auxiliary circuit, which is brought into electrical contact, for a certain time, with the main feed wire of the trolley system, in a similar way to that in which the auxiliary circuit is electrified in the Jordan patent.

It is claimed on behalf of the complainant that the Jordan patent was novel, and completely protected for Jordan's benefit, during the period of its existence, any use of an auxiliary electric circuit located in the manner described by him, and intended or used to operate a signal, i. e., lamp or disk or sound, by means of the current carried to the auxiliary circuit by the automatic contact. The complainant seems to maintain that no difference can be discovered between setting and keeping a signal in operation by an electric current transmitted through the auxiliary circuit and the operation of releasing a signal by removing the supply of an electric current to the signal, through providing an easier path for the electrification of the auxiliary

circuit. It is true that the maintenance of the auxiliary circuit, its method of construction and location, and the means of supplying the current to it, are similar in the complainant's patent and in the defendants' structure. It is also true that the operation of both the patent and the structure causes the sending of a current through the auxiliary circuit while the car is moving over a certain portion of the track; and if these last two functions comprise the scope of the complainant's patent, and if the methods and construction described by him therefor were new in the art and not anticipated by earlier patents, there would seem to be a plain infringement, and the validity of his patent should not be questioned.

As has been said before, the doctrine of equivalents does not seem to be disputed so far as these parts of the invention claimed are concerned, nor does the question of mere mechanical execution enter into the present question. But the complainant's patent adds to the two matters specified the actual operation of a signal, and an examination must be made of the prior art and previous patents in order to see whether the patent in suit is valid, in its claim of invention of a method of operating a signal, and the construction of the apparatus therefor, and at the same time whether (if the electrical operation of a signal be old) the patent can be held valid for the method of construction and supplying of an auxiliary signal current alone; in other words, the giving of a signal by the use of an auxiliary current supplied in the manner described, without reference to the patentability of the method of construction of this auxiliary circuit itself.

Claims 9, 10, and 11 of the patent, as issued, would appear to protect the combination of a trolley wire, with a comparatively short secondary wire, capable of use for signal purposes, and so placed as to be thrown into electrical connection with the trolley wire by the trolley wheel or appliance of the car. The language alone used in these claims would seem to cover a method of construction not necessarily confined to the devices or combinations referred to in the first 8 claims of the patent. But the history of the patent in suit, and the testimony offered in the case, show that the words "substantially as described" in these claims do in fact limit them to the uses and devices described in the earlier claims numbered 1 to 8.

An examination of the file wrapper in evidence and other testimony in the case shows that certain patents, especially that to Leonard, No. 405,896, Loomis, No. 479,138, and Cheney, No. 468,787, were considered, and some of Jordan's original claims rejected upon the ground of these patents.

The Leonard patent was for an electric light, and covered the combination of a series of short wires and a series of long wires, a generator on a moving steam car, a conductor leading from the generator to the wires, and a series of lamps, etc; the idea being that currents should be transmitted from the generator carried by a train to the lamps along a short wire, for the purpose of lighting a particular section of the track. The movement of the train brought the conductor in contact with the short wire, and thus supplied current to the lamps in the circuit thus made, and supplied that current until the conductor moved beyond that particular circuit.

The Loomis and the Cheney patents relate to a device for closing a signal circuit by the passing of a trolley car, and the opening of that circuit when the car reaches a point at the end of the section to be protected; in the Loomis patent this being done by a trigger, through the movement of which the circuit is closed and again opened at the other extreme, while in the Cheney patent the signal circuit would be closed and opened through the movement of a disk, fixed in contact with the trolley wire, in such position as to be forced upward by the trolley wheel.

The Patent Office caused the withdrawal of the claims of the Jordan application, which provided simply for:

"The combination of a trolley wire, one or more signal trolley wires supported adjacent thereto and parallel therewith, but normally insulated therefrom and adapted to be electrically connected, and held connected with the first-mentioned wire by a trolley passing the same, and signal lamps," etc.

It would thus appear that in the first eight claims of the patent as allowed, and in claims 9, 10, and 11, the Jordan patent as allowed could not have covered the mere combination in juxtaposition of a trolley wire and a signal wire with insulation between the two, with some device for causing a current to pass through the signal wire by a conductor set in motion or in electrical contact when the car passes a certain point, and breaking this connection when another point was reached. But the Jordan patent did cover, and was intended to cover, the arrangement of wires in that form, or substantially that form, together with a device or plan for connecting the trolley wire and the signal wire in electrical contact, and for maintaining that contact, and sending a continuous signal current through a device carried by and moving with the car, and thus operating the signal during such contact.

This patent to Jordan was primarily a method of transmitting a signal to some other point along a trolley track, and everything in the patent indicates that Jordan had in mind the necessity of warning persons crossing the track, or in the neighborhood of the track, of the presence of the car which set in motion the signal, rather than the protection of that car, or the reservation of that portion of the track for the use of that car, such as is accomplished by the operation of a block system under any method of signaling. The defendants, on the elevated structure, do not need to set a signal against persons crossing the track, but they do need to keep cars from approaching too near one another, in certain localities, and the defendants' device is therefore used purely for the purpose of a block system.

It is evident that Jordan's device could have been used to set a light near the railroad track for a warning to a car upon the track, instead of a warning to people approaching the crossing. It is also evident that the defendants' block signal could be used at a crossing, and so arranged as to give a signal, or even, by other attachments, ring a bell, when the circuit is closed by the presence of a car. But the question we have to deal with here is whether the defendants are infringing; that is, making use of the ideas and devices actually set forth in the words of the Jordan patent or plainly to be inferred as

within the scope of the language used, or, by the doctrine of equivalents, to be the same principles, but in another form, through changes that are mechanical rather than inventive.

In this aspect of the case, the fact that Jordan's device could be used for the purpose of a block signal is of importance in considering whether Jordan had in mind or provided for the giving of a signal in any other way than by sending a current through the signal itself. We must also determine whether the construction of the main and auxiliary circuits, as in the Jordan patent, was anticipated by patents intended to furnish block signals or signals to preceding and following trains.

Before discussing this question any further, the scope of some of the other patents relied upon as anticipating must be noted.

The Jenkin & Elliott English patent of 1884, No. 8,460, shows a trolley wire or main circuit with an auxiliary circuit and contact caused by a shoe or other sliding contrivance moving with the car. The auxiliary circuit is not grounded, except as it passes through the motor of the car behind, and it there operates a magnet breaking the electrical circuit to the motor of that car. This was not primarily a signaling circuit, except in so far as the breaking of the circuit might be considered a signal, or as examination of the armature might indicate, but the device was intended to be a mechanical circuit-breaker, to prevent collisions. It is doubtful, according to the testimony in this case, whether the Jenkin & Elliott device could be used for the purposes of the defendants' system. Not only did there have to be an insulated return for the entire distance for the signal current, but the breaking of the current would not give information as to the reason therefor. The motorman would not be warned, but would be hindered from proceeding.

The Wicks patents, No. 350,790, of October 12, 1886, and No. 362,409, of May 3, 1887, show a device for maintaining a main and auxiliary circuit, and the passing of a continuous current while the device is in operation, for the purpose of sounding a bell in a locomotive cab, or upon a car, when the signal circuit was closed by the presence of two locomotives or cars within the same section of the signal circuit, the main circuit in the Wicks patent not being intended for the transmission of power to the train, but only of current to the signal.

The Woods patent, No. 385,034, June 26, 1888, shows the presence of an auxiliary circuit, in connection with a main power conductor, but without connection with the ground, and apparently inoperative so far as use like that intended by either Jordan or the defendants is concerned.

The Bentley patent, No. 430,263, of June 17, 1890, shows a device for an electric signal operated by the current which propels the electric motors of the car, and which is transmitted to the signal by a circuit closer, the circuit thus closed remaining until a reverse current is set by the operation of another device, to break the first circuit.

The other patents, Loomis, Leonard, and Cheney, which make use of devices for momentary contact with the moving trolley car, have been spoken of before, and their examination leads to the conclusion that Jordan could not have claimed as original nor patentable the

mere idea of maintaining a signal wire in proximity to the main current wire, nor the idea of sending, by some contact device moving with the car, a current (momentary or constant) through a wire circuit.

Jordan's patent must be confined to the combination of the moving contact over both the main power and the auxiliary signal circuits, and the continuous sending of a current to a signal, from which the ground or other return wire will carry away the current at a sufficiently low potential to make the device operative.

To this extent the Jordan patent would seem to be valid, and the idea contained in the Jordan patent was in that respect novel and patentable.

An examination of the defendants' device, however, does not show the use of Mr. Jordan's idea, nor any infringement of his patent. The defendants' system of signaling must be divided into two parts. By means of the first part a continuous current, through the aid of artificial resistance, is derived from the main power wire through a signal, which is ordinarily set at safety. Any interference with this circuit releases the signal so that it is set at danger. Up to this point there is no similarity to Jordan's ideas. The defendants' system then makes use of the old idea of a sliding contact, as shown in the English Jenkin & Elliott patent, and in the American Leonard and Wicks patents, in order to provide an easier path or a shunting of the current to the auxiliary wire, by which the signal shall be deprived of the current which ordinarily passes through and actuates the magnet holding the signal disk at safety. No attempt is made to send a signal anywhere through or by means of the auxiliary circuit, but the signal is given by changing the position of the device which is to be read as a signal, by depriving it of current, and the Jordan patent neither in terms nor by any proper inference anticipated or planned such a result. In this respect the effect of the defendants' device is more like the action of the English patent than it is like that of Jordan, and the conclusion must be reached that the defendants are not infringing any of the claims of the Jordan patent, in so far as those claims cover a combination of ideas patentable at the time of the issuance of that patent.

The defendant Winter is shown to be merely an officer of the defendant corporation, and to be responsible for the use of the defendant's device only as such an officer, and as to him, apart from his office, no injunction could issue, since no use of the device is shown to have been made by him as an individual. But inasmuch as the defendant corporation does not seem to infringe, his position in the case is no different from that of the defendant corporation, and the complainant's bill must be dismissed as to both defendants.